```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4    ROBOCAST, INC.,                )
                                     )
 5                   Plaintiff,      )
                                     ) C.A. No. 22-304-RGA
 6    v.                             )
                                     )
 7    YOUTUBE, LLC, a Delaware limited)
      liability company; and GOOGLE  )
 8    LLC, a Delaware limited        )
      liability company,             )
 9                   Defendants.     )

10

11                                   J. Caleb Boggs Courthouse
                                     844 North King Street
12                                   Wilmington, Delaware

13                                   Tuesday, December 20, 2022
                                     2:58 p.m.
14                                   Oral Argument

15

      BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
16

17    APPEARANCES:

18              BAYARD, P.A.
                BY:  STEPHEN B. BRAUERMAN, ESQUIRE
19
                        -and-
20
                CANTOR COLBURN
21              BY:  MARC N. HENSCHKE, ESQUIRE

22                                   For the Plaintiff

23

24

25
```

1    APPEARANCES CONTINUED:

2
             RICHARDS LAYTON & FINGER, P.A.
3            BY:  FREDERICK L. COTTRELL, III, ESQUIRE

4                    -and-

5            WILSON SONSINI GOODRICH & ROSATI
             BY:  JORDAN R. JAFFE, ESQUIRE
6
                         For the Defendants
7
                   ***  PROCEEDINGS  ***

02:58:09  8

02:58:09  9        DEPUTY CLERK:  All rise.  Court is now in

02:58:09 10   session.  The Honorable Richard G. Andrews presiding.

02:58:09 11        THE COURT:  All right.  Good afternoon,

02:58:11 12   everyone.  Everyone be seated.

02:58:13 13        Mr. Brauerman.

02:58:14 14        MR. BRAUERMAN:  Good afternoon, Your Honor.

02:58:19 15   Steve Brauerman from Bayard.  I'm joined at counsel table by

02:58:23 16   Marc Henschke of Cantor Colburn on behalf of Plaintiff,

02:58:27 17   Robocast LLC.  With Your Honor's permission, Mr. Henschke

02:58:30 18   will address the Court today.

02:58:31 19        THE COURT:  That's fine.  Good afternoon,

02:58:33 20   Mr. Henschke.  It's been a few years.

02:58:35 21        MR. HENSCHKE:  Yes.

02:58:36 22        THE COURT:  Mr. Cottrell.

02:58:38 23        MR. COTTRELL:  Yes.  Good afternoon, Your Honor.

02:58:39 24   Fred Cottrell from Richards Layton & Finger for the

02:58:42 25   Defendants.  With me at table from Wilson Sonsini, Jordan

02:58:48  1    Jaffe.  And our clients are here, Jim Sherwood from Google

02:58:51  2    and Robin Gray Schweitzer from Google.  And with Your

02:58:55  3    Honor's permission, Mr. Jaffe will discuss the transfer

02:59:00  4    motion that we've filed.

02:59:02  5              THE COURT:  All right.  Thank you.

02:59:04  6              All right.  So, Mr. Jaffe, I don't think I've

02:59:06  7    seen you before; is that right?

02:59:10  8              MR. JAFFE:  That's correct, Your Honor.

02:59:11  9              THE COURT:  All right.  Well, good afternoon.

02:59:12 10              MR. JAFFE:  Good afternoon to you.  I'm here

02:59:16 11    today to address Defendants' transfer motion, as we just

02:59:21 12    discussed.  And I wanted to start by giving a brief overview

02:59:25 13    of why this motion should be granted.

02:59:28 14              This case has no connection in terms of

02:59:32 15    witnesses or documents to Delaware.  In the course of

02:59:37 16    transfer briefing, Defendants are not aware of any witnesses

02:59:41 17    or documents here.  Plaintiffs similarly identified no

02:59:44 18    witnesses or documents here.  The vast majority of the

02:59:47 19    witnesses or documents are in the Northern District of

02:59:51 20    California or are nearer to the Northern District of

02:59:54 21    California than they are to the District of Delaware.  It's

03:00:00 22    also more convenient for the parties to be in the Northern

03:00:03 23    District of California.

03:00:05 24              And in addition to Defendants being

03:00:08 25    headquartered in the Northern District of California, we

03:00:12  1   have also identified third-party prior art residing in the

03:00:16  2   Northern District of California.  And in particular,

03:00:20  3   potential unwilling witnesses in the transferee forum.  We

03:00:25  4   identified one, at least one prior artist in the forum who

03:00:29  5   came up in the prior litigation and was in -- as a prior

03:00:34  6   artist.  And his prior art was asserted by the Defendants in

03:00:38  7   that case on summary judgment.

03:00:39  8        So, this isn't the case where we just picked

03:00:42  9   random prior artists out of a hat that happened to be in

03:00:45 10   California.  This was an actual prior artist who came up

03:00:49 11   within the prior case and is located in the Northern

03:00:52 12   District of California.

03:00:52 13        THE COURT:  The prior art that was asserted on

03:00:56 14   summary judgment, what was that?

03:00:57 15        MR. JAFFE:  It's Mr. Braverman.

03:00:59 16        THE COURT:  No.  What kind of art was it?  Was

03:01:01 17   it a paper, or a patent or what?

03:01:04 18        MR. JAFFE:  It was a paper, and I think there

03:01:05 19   might have been a corresponding system, but I know the paper

03:01:09 20   was asserted.

03:01:10 21        THE COURT:  All right.

03:01:11 22        MR. JAFFE:  The other two instances where

03:01:13 23   we've -- where third-party witnesses are relevant here is

03:01:17 24   Apple itself.  As someone who's settled the patent, there

03:01:21 25   will likely be relevant testimony and evidence relating to

1  damages, licenses, and so Apple will be a potential relevant

2  witness for purposes of trial, which is subject to the

3  subpoena power of that Court.  These patents are also

4  expired, and two of the three patents expired several years

5  ago.

6          And in this instance, former employees become

7  more relevant.  And given that Defendants, YouTube and

8  Google are both headquartered in the Northern District of

9  California, the former employees would more likely be based

10  there and, therefore, is subject to the Court's subpoena

11  power.

12          Finally, in terms of overall convenience, we've

13  talked a bit about how it's more convenient for the

14  Defendants and third parties.  When you look at the

15  underlying facts that Plaintiff put in opposition to our

16  motion, it's likely actually more convenient for Plaintiff

17  than it is to be in Delaware.  Specifically, they put in a

18  declaration from a Mr. Torres, and that declaration was in

19  Idaho.  And they put in a statement to the Secretary of

20  State in Idaho saying their principal office was there.

21  That's closer to California than it is to here.

22          So, the CEO and sole inventor of the

23  patents-in-suit is in Idaho and as well as their COO.  So,

24  they have identified two of their four employees are in

25  Idaho.  Two are in New York.  So, in the balance, given

03:02:50  1    Defendants and third parties, as well as at least half of

03:02:54  2    the employees on the Plaintiff's side --

03:02:56  3            THE COURT:  So, I remember Mr. Torres because he

03:03:02  4    used to come to Court for a lot of the proceedings which, of

03:03:05  5    course, is because he was based in New York at the time.

03:03:10  6    Coincidentally, like three or four years ago, he came up to

03:03:13  7    me at an event in New York and introduced himself because I

03:03:18  8    wouldn't have recognized him otherwise.  And we spoke for

03:03:21  9    like two minutes or so, you know, pleasantries.  So, I

03:03:26 10    remember him, but what I don't understand is with expired

03:03:34 11    patents, and as far as the record shows, I think, it's not

03:03:41 12    as though Robocast is making something or selling something.

03:03:46 13            I'm kind of wondering:  What do the four

03:03:49 14    employees do; do you know?

03:03:52 15            MR. JAFFE:  So, we do not know.  I think,

03:03:55 16    reading their declaration, it's kind of vague as to what the

03:03:58 17    business operations of the entity are.  We do know that they

03:04:05 18    raised some money recently.  It's in one of their exhibits.

03:04:10 19    But other than this litigation, we don't know what their

03:04:14 20    operations are.  I sort of defer to Plaintiff's counsel on

03:04:18 21    what those specific operations are.

03:04:21 22            THE COURT:  The money they raised, tell me more

03:04:25 23    about that because I don't remember seeing that.

03:04:27 24            MR. JAFFE:  Yes.  It was something that I

03:04:29 25    actually noticed in preparing for today's hearing.  They

03:04:33 1    attached the Robocast LinkedIn profile.  This is Exhibit T

03:04:37 2    to their opposition, Docket Entry 34-20.  And on ECF Page --

03:04:46 3            THE COURT:  You don't need to tell me where it

03:04:48 4    is, just tell me what it says.

03:04:50 5            MR. JAFFE:  Okay.  Sure.  This is a LinkedIn

03:04:52 6    post by Robocast.  It says, "Ahead of our public launch, we

03:04:57 7    are thrilled to be able to announce a follow-on investment

03:04:59 8    (for an undisclosed amount) from Brown Venture Group,

03:05:03 9    Dr. Chris Brooks, Dr. Paul Campbell, Chris Dykstra, Jerome

03:05:07 10   Hamilton," and it says "-- BVG is an especially strategic

03:05:13 11   addition to our growing list of follow-on investors in our

03:05:16 12   currently active $35 million Series B round.  We look

03:05:20 13   forward to our continued partnership during this exciting

03:05:24 14   period of innovation."

03:05:25 15           THE COURT:  Is there a date with this post?

03:05:28 16           MR. JAFFE:  So, it's three -- it says three

03:05:30 17   months ago from when this was printed, which was in

03:05:34 18   November, November 9th.  So...

03:05:37 19           THE COURT:  All right.  Go ahead.

03:05:40 20           MR. JAFFE:  Sure.  So, if I can back up, we

03:05:47 21   think that the factors overwhelmingly support transfer in

03:05:52 22   this instance.  Other than the company being founded in

03:05:56 23   Delaware and its strategic litigation choice is to sue here,

03:06:00 24   there are no connections to Delaware.  And, in fact, when we

03:06:04 25   look at the evidence that's provided here, again, the bulk

03:06:07  1    of it is in California or closer to California.

03:06:10  2         Your Honor's decision in *Express Mobile vs.*

03:06:17  3    *Web.com* provides a good roadmap to what the same result

03:06:23  4    should be here.  In that case, Defendants were asking for

03:06:27  5    transfer to the Middle District of Florida, and the

03:06:31  6    Plaintiffs were based in the Northern District of

03:06:33  7    California.  And Defendants were a Delaware corporation that

03:06:38  8    was headquartered in Florida.  And despite the Plaintiff

03:06:42  9    being a Delaware corporation, Your Honor found that transfer

03:06:46 10    was appropriate.  And the same analysis should apply here.

03:06:51 11         And in particular, just to rebut a couple of

03:06:54 12    their main points on this, they rely heavily on their choice

03:06:57 13    of forum here in this district referring to it as a

03:07:00 14    paramount consideration.  And Your Honor addressed this

03:07:03 15    exact point in the Express Mobile decision by saying, "By

03:07:08 16    paramount, I understand the Court of Appeals to indicate

03:07:09 17    that the Plaintiff's choice is the most important factor.

03:07:12 18    That is the law.  But beyond that, the balancing of factors

03:07:15 19    is going to be influenced by other factors which are related

03:07:19 20    to where a Plaintiff is physically located, et cetera.

03:07:23 21    Thus, it is still the most important factor when a Plaintiff

03:07:26 22    has a principal place of business outside Delaware or has no

03:07:30 23    connection to Delaware other than its choice to sue here or

03:07:34 24    other than its choice to sue here and its Delaware

03:07:36 25    incorporation."

03:07:37 1          And we have the same facts here.  We have a

03:07:41 2   Delaware Plaintiff who is incorporated here and has chosen

03:07:45 3   to sue here, but that alone isn't enough.

03:07:49 4          The other argument I want to address is their

03:07:51 5   argument that Your Honor addressed, one of the three

03:07:54 6   patents-in-suit before, and, therefore, by considerations of

03:07:58 7   judicial economy, that the Court should keep the case.  And,

03:08:03 8   again, Your Honor's decision in Express Mobile, I think, is

03:08:07 9   helpful on this one where --

03:08:10 10          THE COURT:  Yeah, even though I think in that

03:08:12 11   one didn't I say that I had essentially a glancing contact

03:08:16 12   with the patent in the past, not -- I mean, I've got more to

03:08:23 13   say about this, but the two Robocast cases I had before were

03:08:28 14   litigated virtually up to the eve of trial.  I think one of

03:08:32 15   them was the eve of trial.  The other one may have been not

03:08:35 16   quite that close.

03:08:38 17          I still remember because it's the longest

03:08:40 18   Markman hearing I ever had.  I had a five-hour Markman

03:08:44 19   hearing.  I'm not going to do that again.  You know, there

03:08:49 20   was lots of briefing on summary judgment.  You know, so I

03:08:58 21   don't particularly remember it.

03:09:00 22          I assume I went through the pretrial conference

03:09:03 23   at least for one of the two cases and, you know, probably

03:09:06 24   decided motions in limine.  And, I mean, short of actually

03:09:13 25   having a trial, it would be hard to imagine that I would

03:09:16 1   engage with a patent as much as I did in those two cases,

03:09:22 2   which I think is completely different than when I

03:09:26 3   transferred the Express Mobile case.

03:09:29 4          MR. JAFFE:  Yeah, I'd be happy to address that.

03:09:32 5   So, I think there are two, what I'll call, flavors of the

03:09:35 6   judicial economy argument here.

03:09:37 7          One is based on Your Honor's prior work on the

03:09:39 8   Apple and Microsoft cases, and one is based on the

03:09:42 9   co-pending case against Netflix.  So, in addressing the

03:09:45 10  Apple and Microsoft issue which you just brought up, I think

03:09:49 11  there are a number of points of distinctions which are

03:09:51 12  important here.

03:09:51 13         Number one is those are different Defendants

03:09:53 14  with different accused technology, different issues.  So,

03:09:56 15  there are going to be different issues that come up in this

03:09:58 16  case than in that case.

03:09:59 17         The second is the -- it only addressed one of

03:10:03 18  the three patents-in-suit.  So, the '451 Patent was at

03:10:06 19  issue, but the other two patents were not at issue.

03:10:08 20         THE COURT:  But the three patents here, don't

03:10:11 21  they have the same specification?

03:10:12 22         MR. JAFFE:  That's correct, Your Honor.

03:10:13 23         THE COURT:  So, it's not like they're three

03:10:17 24  different patents in different technology fields.  They're

03:10:21 25  basically the same invention, just claimed differently in

03:10:26  1    the subsequent patents.

03:10:27  2            MR. JAFFE:  Yes, they are related patents.  I

03:10:29  3    absolutely agree with that.  And I wasn't meaning to state

03:10:33  4    that they're completely unrelated.  There are just two new

03:10:36  5    patents with additional claims to address that Your Honor

03:10:40  6    didn't consider before.  And prosecution history from each

03:10:43  7    of those will be at issue that Your Honor didn't consider

03:10:46  8    before.

03:10:47  9            And in addition, there's also the issue of the

03:10:51 10    passage of time.  I think Your Honor's mentioning when

03:10:53 11    Mr. Torres came up to you, and you didn't recognize him is

03:10:56 12    helpful in kind of elucidating this point that it's been a

03:11:00 13    long time since those cases were litigated.

03:11:02 14            THE COURT:  Yeah.  No, I was going to say that.

03:11:05 15    You know, honestly, in terms of the technology involved, I

03:11:09 16    remember the same thing as anybody else who reads whatever

03:11:13 17    paper trail I left.  I have no -- you know, I remember the

03:11:18 18    word nodes being very important because that's what we did

03:11:22 19    spend the five hours on the Markman on, but I can't say that

03:11:27 20    I'm very optimistic that any of this is going to come back

03:11:31 21    to me faster than it would come back to some other judge

03:11:34 22    starting from scratch.

03:11:35 23            MR. JAFFE:  I think that's exactly right, Your

03:11:37 24    Honor.  And you're in good company in making that

03:11:39 25    consideration because the Federal Circuit has found in the

03:11:44  1   Verizon case where there was a case which was settled five

03:11:47  2   years, I think, before that case, and they just mentioned

03:11:51  3   that the trial Court's previous handling of a lawsuit

03:11:54  4   involving the same patent that settled more than five years

03:11:57  5   before this suit was filed.

03:12:00  6           And I cut off the beginning of the sentence, but

03:12:02  7   the next sentence is the key one which says, "The Eastern

03:12:05  8   District of Texas would have to re-learn a considerable

03:12:07  9   amount based on the lapse of time between the two suits and

03:12:10 10   would likely have to familiarize itself with re-examination

03:12:13 11   materials that were not part of the record during the

03:12:15 12   previous suit."

03:12:16 13           So, we don't have a re-examination here, but we

03:12:18 14   do have two different patents.  And I think it's analogous

03:12:22 15   and, logically speaking, it gets at the same result which

03:12:24 16   is, yes, Your Honor, worked on those cases and a lot of work

03:12:29 17   went into those cases, but they were different Defendants

03:12:31 18   involving one of the three patents.  And those cases were

03:12:35 19   filed almost a decade ago.

03:12:37 20           THE COURT:  They were filed more than a decade

03:12:39 21   ago.  I just got them a decade ago.  But they were --

03:12:43 22   somebody else was handling them before me.  I don't --

03:12:46 23   actually, never mind that.  Yeah, they're a decade old.

03:12:49 24           MR. JAFFE:  So, given the passage of time, those

03:12:51 25   do not suggest transfer because, as Your Honor mentioned,

03:12:55 1    you're going to have to re-learn the materials just as much

03:12:57 2    as any other judge would, in some instances, but not all.

03:13:01 3              THE COURT:  So, you also said the co-pending

03:13:07 4    case.  You were going to address that.

03:13:10 5              MR. JAFFE:  Yes.  So, the second kind of flavor

03:13:13 6    of judicial economy here is the co-pending case against

03:13:17 7    Netflix.  And there are a couple of distinctions there that

03:13:19 8    I want to make clear.

03:13:20 9              Number one is that case is in its relative

03:13:24 10   infancy.  There's been no schedule.

03:13:26 11             THE COURT:  Right.  I mean, they were filed the

03:13:27 12   same day.

03:13:28 13             MR. JAFFE:  There's been no schedule set in that

03:13:30 14   case.  It is addressing the same three patents that are at

03:13:33 15   issue in this case, but it's addressing different accused

03:13:37 16   product, different technology, which means there's likely

03:13:39 17   going to be significantly different discovery at issue, and

03:13:43 18   therefore, is not the same for purposes of the transfer

03:13:46 19   analysis.

03:13:47 20             THE COURT:  Remind me of who the Defendant is in

03:13:49 21   the other case.

03:13:50 22             MR. JAFFE:  Netflix, Your Honor.

03:13:51 23             THE COURT:  Where are they headquartered?

03:13:53 24             MR. JAFFE:  They are headquartered in the

03:13:56 25   Northern District of California, I believe.

03:14:00 1          THE COURT:  Okay.

03:14:01 2          MR. JAFFE:  On the point about the distinction

03:14:04 3   of the co-pending case, if I can make two points.  One is

03:14:09 4   the Federal Circuit has repeatedly stated that the presence

03:14:11 5   of a co-pending litigation by itself should not drive and

03:14:16 6   tip the scales to keeping a case that otherwise should be

03:14:19 7   transferred.  I almost think back to kind of the difference

03:14:21 8   between pre-AIA and post-AIA where you would kind of sue

03:14:25 9   five Defendants to be able to anchor the lawsuit in one,

03:14:28 10  even where one Defendant was properly transferred.

03:14:31 11         I think you can kind of make the same sort of

03:14:34 12  argument here where the presence of Netflix staying here

03:14:38 13  shouldn't outweigh the other considerations in the transfer.

03:14:40 14         THE COURT:  In that regard, did you have any

03:14:45 15  conversation with Netflix's counsel, because leaving aside

03:14:52 16  all the transfer factors, it does seem relatively ridiculous

03:14:59 17  to have one case here and one case in California on the same

03:15:04 18  three patents when both cases could be here or both cases

03:15:11 19  could be in California, but it seems like the worst possible

03:15:15 20  solution is to have one case here and one case there.

03:15:19 21         MR. JAFFE:  So, to address the first point is my

03:15:23 22  understanding is Netflix is not moving to transfer which is

03:15:27 23  public record.

03:15:27 24         THE COURT:  So, they haven't filed a motion?

03:15:29 25         MR. JAFFE:  Yeah.  And so, that kind of is their

03:15:32  1   own choice.  I think it goes back to 1404 being a

03:15:35  2   case-by-case basis.  I take Your Honor's point --

03:15:38  3           THE COURT:  But Netflix isn't going to have any

03:15:40  4   employees or documents here, either.  I mean, they're going

03:15:43  5   to be virtually -- I mean, I'm not trying to encourage them

03:15:49  6   to file a motion, but they could make the exact same

03:15:52  7   arguments you're making, I'm confident.

03:15:58  8           MR. JAFFE:  I'm sure they could.  And in terms

03:16:02  9   of them being a candidate for transfer, they are based in

03:16:05 10   the Northern District of California as well.

03:16:08 11           I think for our point, to address Your Honor's

03:16:10 12   question in terms of the potential for two judges handling

03:16:14 13   the same case, this, again, goes back to the point that 1404

03:16:19 14   transfer should be done on an individualized case-by-case

03:16:22 15   basis.  And the pending case should not drive the transfer

03:16:26 16   decision.

03:16:26 17           And there's actually a Federal Circuit case.

03:16:29 18   This is arising from the Fifth Circuit going up to the

03:16:33 19   Federal Circuit, so not directly from the Third Circuit, but

03:16:35 20   I think gets at this exact point.  It's the In Re:  Dish

03:16:39 21   Network decision where the Federal Circuit stated,

03:16:45 22   "Moreover, each of BBiTV's co-pending suits in the Western

03:16:49 23   District of Texas involve different Defendants with

03:16:51 24   different hardware and different software.  Thus, as in

03:16:54 25   Samsung, they are, therefore, likely to involve

03:16:57 1   significantly different discovery and evidence.  Applying

03:17:00 2   the same analysis we applied in Samsung here requires that

03:17:03 3   we conclude that any judicial economy considerations in

03:17:07 4   keeping this case in Texas are insufficient to outweigh the

03:17:11 5   clear benefits to transfer in light of the imbalance of the

03:17:14 6   parties' respective presentations on the other private

03:17:17 7   interests and public interest factors."

03:17:20 8           I would submit that the same thing is true here

03:17:23 9   in terms of the -- just because they filed here in this case

03:17:27 10  can't anchor another Defendant's case here because they've

03:17:31 11  chosen not to file a motion to transfer.

03:17:33 12          THE COURT:  So, one of the other things that I

03:17:34 13  think the Plaintiff said talking about anchoring was on at

03:17:45 14  least one occasion, and I think on more, Google's filed

03:17:49 15  declaratory judgment actions here.  And I think your

03:17:55 16  response in your brief was, Well, jeez, they didn't want to

03:17:58 17  be in Texas, so where else could they file it?  But doesn't

03:18:01 18  it seem that the argument that convenience requires transfer

03:18:11 19  sort of -- don't you kind of contradict yourself, not you

03:18:17 20  personally, but your company, your client by saying, well,

03:18:20 21  when we want to transfer, you should transfer it.  When you

03:18:23 22  want to file suit in Delaware, you should keep it?

03:18:25 23          MR. JAFFE:  Yeah.  I'm happy to address that,

03:18:29 24  Your Honor.  There's two things I think to respond to that.

03:18:32 25          Number one, was the -- I think that you

03:18:34 1    mentioned the Geotag litigation.  It was an instance where I

03:18:38 2    think they had filed, you know, hundreds of lawsuits.

03:18:42 3                THE COURT:  Oh, yeah, yeah.  I don't remember

03:18:43 4    the technology, but I remember the numbers.

03:18:45 5                MR. JAFFE:  And in the filing that, the

03:18:51 6    Plaintiff attached to their motion Google notes that

03:18:54 7    Delaware was likely the only jurisdiction available other

03:18:58 8    than Texas where they were filing the other lawsuits.  So, I

03:19:03 9    think that was kind of the reason why Delaware was the

03:19:06 10   appropriate location.

03:19:07 11               But to answer Your Honor's question in terms of

03:19:09 12   the inconsistency, it's just not relevant here because each

03:19:13 13   case has to be addressed on its merits.

03:19:17 14               THE COURT:  But in a way and, you know, and I

03:19:22 15   don't question that you're accurately citing what the

03:19:26 16   Federal Circuit has said from time to time, but it does seem

03:19:42 17   relevant in some sense when we're talking about convenience

03:19:48 18   that not only are you able to litigate in Delaware, which

03:19:59 19   nobody ever questioned, but that sometimes, for one reason,

03:20:08 20   that's where you choose to litigate.  And not just, you

03:20:11 21   know, you're sued in the Court of Chancery for something

03:20:15 22   because you're a Delaware corporation, but that these very

03:20:21 23   same kinds of cases that, you know, you're now saying the

03:20:24 24   balance of convenience, you know, requires transfer to the

03:20:33 25   Northern District, you know, some years ago, not you

03:20:37 1   personally, but someone was saying it would be an abuse of

03:20:41 2   discretion for me to transfer a case to Texas where there

03:20:45 3   were already 300 pending cases involving the same

03:20:48 4   technology.

03:20:49 5            I mean, doesn't that just seem to have some

03:20:58 6   relevance here?

03:20:59 7            MR. JAFFE:  In terms of -- I think under the

03:21:04 8   Federal Circuit's and the Supreme Court's discussion of 1404

03:21:08 9   that each case has to be evaluated on and so on, I think

03:21:11 10  that gets at the real answer to your question, which is

03:21:14 11  let's say that we had the same accused functionality, the

03:21:17 12  same witnesses, the same third-party witnesses at issue in

03:21:20 13  this case as in the Geotag case.  Then I think Your Honor

03:21:23 14  would be exactly correct that there would be an incongruence

03:21:27 15  between the two.

03:21:27 16           But here, the evidence that we put forward in

03:21:30 17  terms of the convenience of the parties, convenience of the

03:21:32 18  third parties, practical considerations on where the

03:21:35 19  inventor of the patents-in-suit is closer to ND of Cal, all

03:21:39 20  those considerations weigh in consideration of transfer

03:21:42 21  here.  So, I think the true answer to your question is just

03:21:45 22  to look at the applications of the specific factors.  And

03:21:49 23  stepping back, the fact that Google is moving to transfer

03:21:52 24  this suit, has not moved to transfer others and has filed

03:21:54 25  here and others, gives credence to the fact that Google is

1    rationally thinking about these things and putting forth

2    some judgment on which ones to file transfer motions and

3    which ones are not because of the consideration of these

4    factors.

5            THE COURT:  Well, so one of the things that, you

6    know, I do remember thinking about when I had the transfer

7    motions, you know, it's not a technology thing.  That's the

8    reason I remember it.  But when I had the transfer motions

9    with Robocast a decade ago, one of the things, and I don't

10   remember whether I put it down in the opinion or not, but it

11   did seem that the imbalance between the size of the

12   Defendants and Robocast, who I think at the time I made the

13   decision I thought was pretty much a one-person operation --

14   but if it had been a four-person operation, it wouldn't have

15   been any different -- was that it seemed a lot like the

16   transfer motion was just being used to try to gain leverage

17   in the litigation.  That any sort of rational analysis back

18   then was Robocast located in New York, some history of being

19   a Delaware corporation, close by.  This was much more

20   convenient for Robocast to litigate here than it was to

21   litigate in the Northern District of California.

22           Now, today, yes, okay, Mr. Torres apparently

23   lives in Idaho.  And it does seem to me that, although

24   Mr. Henschke may tell me something else, but it does seem to

25   me like he's in between 95 and a hundred percent of

03:23:53  1   Robocast, and it's not quite as easy for him.  And yet, he

03:24:02  2   still put Delaware.

03:24:03  3          You know, and why shouldn't there be, for lack

03:24:09  4   of a better word, some -- you know, leaving aside the

03:24:12  5   paramount consideration, why shouldn't there be some

03:24:16  6   acknowledgment that his resources are, as many of us are

03:24:24  7   dwarfed by your resources, and that maybe that ought to

03:24:28  8   count for more in his choice of where to sue?

03:24:32  9          MR. JAFFE:  In terms of how that fits into the

03:24:36 10   transfer analysis, I think I want to take it piece by piece.

03:24:39 11   First, you mentioned his choice of where to sue.  That is

03:24:44 12   actually addressed under the paramount consideration

03:24:46 13   factors.  So, I think given that they are not a -- they

03:24:49 14   don't have an office here, that is entitled to reduced

03:24:53 15   weight.

03:24:53 16          In terms of the relative financial sizes of the

03:24:58 17   parties, the record evidence indicates that they are a

03:25:02 18   four-person company with the CEO and president present in

03:25:05 19   Idaho.  That is indisputably closer to California than it is

03:25:10 20   to Delaware.  So, if, you know, we're looking at the

03:25:15 21   convenience of the parties here, simply saying I want to be

03:25:19 22   in Delaware is not a convenience issue.

03:25:22 23          THE COURT:  Well, you know, sometimes it is.

03:25:24 24   There's a lawyer in the Northern District of California who,

03:25:30 25   you know, I've met at other events and, you know, she's

03:25:36  1    explained that her parents live in New Jersey, and that

03:25:40  2    that's why Delaware is convenient for her clients because

03:25:44  3    she likes to come to Delaware so she can go visit her

03:25:48  4    parents.  And, you know, it's not hard for me to believe

03:25:52  5    though, you know, it's complete speculation, that Mr.

03:25:57  6    Torres, who I gather, based on my random meeting of him a

03:26:03  7    few years ago, and what I kind of recall about, you know,

03:26:08  8    the Lower East side or something back in 2011 or '12, I

03:26:16  9    wouldn't be surprised if it's not convenient for him to come

03:26:20 10    east because he's -- probably most of the people he knows in

03:26:23 11    the world still live in New York City.

03:26:26 12            MR. JAFFE:  You know, Mr. Torres did not put

03:26:29 13    that in his declaration.

03:26:30 14            THE COURT:  It's conceded.

03:26:31 15            MR. JAFFE:  And to the extent that they had put

03:26:34 16    forward evidence that he has relatives or it is in some

03:26:39 17    sense more convenient for him to come here because it has

03:26:42 18    proximity to New York, they didn't put in that evidence.

03:26:45 19    And I think going back to Your Honor's prior issue of

03:26:48 20    transfer, I think it's notable because the facts have

03:26:52 21    changed since that decision in important ways.

03:26:56 22            Number one, we have obviously different

03:26:59 23    Defendants at issue and so there's different evidence.

03:27:01 24    There are different third parties that we've identified

03:27:03 25    relevant to the transfer analysis, including Mr. Braverman,

03:27:07  1    as I mentioned before.  And the structure of Robocast in the

03:27:11  2    presence has changed.

03:27:13  3           In Your Honor's prior Order, you noted that

03:27:15  4    Mr. Torres came to the courtroom for purposes of the

03:27:18  5    transfer hearing.  I note that he signed a declaration.  The

03:27:23  6    only fact declaration that they put in in response to our

03:27:26  7    opposition other than an attorney declaration was from

03:27:29  8    Mr. Torres from Idaho.  So, the facts have changed.

03:27:34  9           In addition, we noted that their principal

03:27:37 10    office appears to be in Idaho.  And two of the four

03:27:40 11    employees, including the sole named inventor of all three

03:27:43 12    patents, is in Idaho.

03:27:45 13           So, as a net point here is what Your Honor

03:27:53 14    looked at previously in those Apple and Microsoft cases, the

03:27:56 15    facts have changed. And because we're dealing with different

03:27:58 16    facts, the outcome changes as well.

03:28:01 17           One other point that I'll mention in terms of

03:28:03 18    the difference between the prior Robocast transfer analysis

03:28:05 19    and ours is the Plaintiffs in those cases mentioned, kind of

03:28:10 20    listed all the prior art that they could find on the face of

03:28:13 21    the patent.  Isolated, you know, some half dozen or a

03:28:16 22    quarter that were in the Northern District of California,

03:28:18 23    and said, See, here are the prior artists that are in

03:28:21 24    California within the subpoena power.

03:28:23 25           As I mentioned before, we have the benefit of

03:28:26 1   looking at that prior litigation and seeing that at least

03:28:29 2   Mr. Braverman and some other prior art as well were based in

03:28:33 3   the Northern District of California and subject to the

03:28:36 4   subpoena power there.  That was not something that Your

03:28:39 5   Honor had the benefit of in those prior transfer motions

03:28:41 6   that we do now.

03:28:42 7            THE COURT:  In the declaration and whatever

03:28:48 8   evidence you submitted, I think there were, besides from

03:28:52 9   Mr. Braverman, there was a second prior artist.  Did you

03:29:00 10  actually show that they live today in the Northern District

03:29:05 11  of California?

03:29:05 12           MR. JAFFE:  So the second one is our counsel --

03:29:07 13  opposing counsel pointed out she appears to have moved to

03:29:10 14  Washington.

03:29:11 15           THE COURT:  Okay.

03:29:12 16           MR. JAFFE:  But the paper itself, it has on its

03:29:16 17  title it came out of what's called Xerox PARC which is in

03:29:19 18  Palo Alto.  So, even if the prior artist has moved to

03:29:23 19  Washington, which is still closer to the Northern District

03:29:26 20  than it is to Delaware, the source --

03:29:28 21           THE COURT:  But not within the subpoena power of

03:29:30 22  either?

03:29:30 23           MR. JAFFE:  Absolutely, Your Honor.  You're

03:29:32 24  correct.  But the source of the prior art, which is Xerox

03:29:36 25  PARC, is still within the subpoena power of the Northern

03:29:38  1   District.  So, we could subpoena the actual company for

03:29:41  2   records about the prior art system and about the prior art

03:29:44  3   paper, but I grant you that the actual individual has moved.

03:29:47  4                THE COURT:  And what about Mr. Braverman?

03:29:50  5                MR. JAFFE:  As best we can tell from his

03:29:52  6   LinkedIn, he is in the Northern District of California.

03:29:55  7                THE COURT:  Okay.  Well, so I've given you

03:29:57  8   plenty of time here.  I should hear from Mr. Henschke.  I've

03:30:01  9   got the general -- I think I understand most of your

03:30:06 10   arguments here.

03:30:07 11                MR. JAFFE:  Thank you, Your Honor.

03:30:08 12                THE COURT:  Thank you, Mr. Jaffe.

03:30:19 13                MR. HENSCHKE:  Thank you, Your Honor.  I guess I

03:30:22 14   would say, first, before I get into what I planned to talk

03:30:26 15   about, one thing I did not expect to hear today was Google

03:30:29 16   making representations about what's in the best interest of

03:30:33 17   Robocast and where Robocast should believe it's most

03:30:37 18   convenient to litigate.

03:30:38 19                Robocast has chosen to file suit in Delaware, as

03:30:42 20   it always has historically.  Mr. Torres has filed the

03:30:46 21   declaration asserting that Delaware is by far more

03:30:49 22   convenient for himself and the company to be litigating in

03:30:53 23   the Northern District of California.  And I'm not sure how

03:30:57 24   Google can possibly stand here and say that Robocast's

03:31:01 25   interests are other than what the only evidence of record

1   suggests Robocast's interests are.

2          A lot of free forum kind of issues came up here

3   in the initial discussion with Mr. Jaffe, and I'll try my

4   best to respond to those and work them in.  But I think the

5   main thing that's missing here and that's been missing from

6   this discussion is tying these facts into the appropriate

7   legal standards, the appropriate burden of proof, the

8   appropriate Jumara factors, and look at what those legal

9   requirements actually are, because a lot of the things that

10  have been discussed and a lot of the way the facts have been

11  laid out don't really respond to what the legal requirements

12  are here.

13          So, starting with the burden of proof, I mean, I

14  think that really begins and ends this whole issue of

15  transfer here.  There is a -- on any moving party for a

16  transfer motion, there's an extremely heavy burden of

17  proving that these Jumara factors weigh strongly in favor of

18  transfer.

19          And here, I would suggest, and you have

20  suggested in your prior cases, that that heavy burden is

21  heightened even further given the profile of these

22  particular Defendants.  As this Court held in its InvestPic

23  case and elsewhere, when you have multi-billion-dollar

24  companies like Google-YouTube who are doing business on an

25  international scale, the burden of proving transfer is even

03:32:28  1    higher than normal.  And it's already a high burden in the

03:32:31  2    first place.

03:32:31  3           So, at the end of the day, the burden of proof,

03:32:34  4    I would suggest, is what this Court itself previously

03:32:37  5    suggested in the cases that Robocast brought against Apple

03:32:43  6    and Microsoft which Your Honor handled for three-and-a-half

03:32:47  7    years in great depth.  And what Your Honor said in that

03:32:51  8    decision in that case denying transfer to the Northern

03:32:58  9    District of California under similar circumstances is, "I

03:33:01 10    think that when the Plaintiff is a three-person corporation

03:33:05 11    with Delaware as its long-standing corporate home and the

03:33:08 12    Defendant is Apple, there ought to be a compelling reason to

03:33:12 13    overcome Plaintiff's choice of forum."

03:33:15 14           So, this is the situation we're in here, and

03:33:19 15    Google-YouTube has not demonstrated anything close to a

03:33:22 16    compelling reason why this case should be transferred to the

03:33:26 17    Northern District of California.  To the contrary, several

03:33:31 18    of the most important of the Jumara factors strongly favor

03:33:35 19    keeping the case here in Delaware.  And so, I would submit

03:33:39 20    to the Court that it would be impossible for Google-YouTube

03:33:42 21    here to meet that kind of heightened burden.

03:33:45 22           So, Jumara private interest factors.  I guess

03:33:51 23    the first point I would make would be that not all factors

03:33:54 24    are created equal.  There, obviously, in the law are some of

03:33:58 25    these factors which have been, especially in the Third

03:34:01  1   Circuit, accorded a great deal of more importance than

03:34:03  2   others.

03:34:04  3          And the quintessential example of that, of

03:34:08  4   course, is factor one, which is the Plaintiff's forum

03:34:12  5   preference.  Under Third Circuit law, that's to be treated

03:34:15  6   by far as the most important of any of the factors in the

03:34:18  7   balancing test.  And essentially, so long as Plaintiff has

03:34:23  8   legitimate and rational reasons for its choice of forum, the

03:34:27  9   Third Circuit says that that should be the paramount

03:34:31 10   consideration in deciding appropriate venue.

03:34:34 11          So, does Robocast have legitimate and rational

03:34:38 12   reasons for having brought this suit in Delaware?  Well, of

03:34:41 13   course, it does.  It has several different legitimate

03:34:44 14   reasons.

03:34:44 15          Starting, first of all, that all of these

03:34:48 16   entities here, including Robocast and including the

03:34:51 17   Defendants, are long-standing Delaware companies, all of

03:34:54 18   whom have willingly submitted to being sued in this state.

03:34:58 19          Secondly, all of Robocast's previous patent

03:35:03 20   infringement litigations involving the same patents and the

03:35:06 21   same technology were brought in Delaware and, indeed, were

03:35:10 22   handled by Your Honor back in the early days of Your Honor's

03:35:14 23   judgeship.  Those prior litigations have extensively

03:35:19 24   familiarized this Court with the patents and the technology

03:35:23 25   and --

03:35:24  1          THE COURT:  Theoretically, yes, but

03:35:25  2   realistically, no.  The only advantage is perhaps I can read

03:35:30  3   my prior opinion better than someone who didn't write them

03:35:34  4   in the first place.  But --

03:35:36  5          MR. HENSCHKE:  Well, I've, you know, had to go

03:35:38  6   through the same exercise that you will, Your Honor, and

03:35:40  7   trust me, it comes back very quickly.  And it certainly

03:35:43  8   comes back --

03:35:44  9          THE COURT:  Maybe for you.

03:35:45 10          MR. HENSCHKE:  Yes.  It comes back far more

03:35:47 11   quickly than some judge who has absolutely no familiarity

03:35:50 12   with these patents or technology in Northern California who

03:35:54 13   is essentially starting from scratch.

03:35:57 14          The other aspect of this is, you know, in

03:36:01 15   addition to all the familiarity and the hard work the Court

03:36:03 16   and the parties put in in this district to developing those

03:36:07 17   issues, there's a lot of very extensive and helpful

03:36:11 18   precedent on issues that are important to these cases that

03:36:14 19   Your Honor has established.  Your Honor issued a Markman

03:36:19 20   Claim Construction Order that covers the very patent that's

03:36:21 21   at the heart of this case right now, the '451 parent Patent,

03:36:24 22   which is very viable today and, indeed, is being used today

03:36:30 23   as we stand here in IPRs where your Claim Construction

03:36:35 24   Orders have literally been submitted and are dictating the

03:36:38 25   outcome of the IPR process.  Right.

03:36:40  1          THE COURT:  Sorry, there's IPRs on these

03:36:42  2   patents?

03:36:43  3          MR. HENSCHKE:  Yes, there recently have been

03:36:45  4   filed IPRs.  Whether they end up being instituted or not, I

03:36:48  5   don't know.

03:36:49  6          THE COURT:  I didn't know the PTAB could do IPRs

03:36:56  7   on expired patents.  But they can?

03:36:59  8          MR. HENSCHKE:  There's some debate about that in

03:37:02  9   those particular IPRs, but they believe they can at the

03:37:06 10   moment.

03:37:07 11          THE COURT:  Okay.

03:37:08 12          MR. HENSCHKE:  But, in any event, your claim

03:37:10 13   construction is what's being used as the basis of those IPR

03:37:13 14   analyses.  You also made extensive summary judgment rulings

03:37:17 15   on invalidity issues, and infringement issues, and

03:37:21 16   damages-related issues, and prior conception-related issues,

03:37:25 17   inequitable conduct issues.  I mean, this was

03:37:29 18   three-and-a-half years of intensive litigation.  And the

03:37:31 19   amount of substantive decisionmaking and work that Your

03:37:34 20   Honor put into this is the highest level it could possibly

03:37:38 21   be.  And all of that stuff continues to be highly relevant

03:37:41 22   and will be in these cases.  So, it's not just the

03:37:44 23   familiarity that you developed with this, which I believe

03:37:47 24   can be recaptured, but it's also the important body of

03:37:51 25   precedent that's sitting there.

03:37:52  1          Another reason, of course, Robocast has a

03:37:57  2    legitimate basis for suing in Delaware is that its companion

03:38:01  3    case against Netflix, as you said, filed on the same day is

03:38:05  4    here in Delaware.  Exact same patents.  Same type of accused

03:38:08  5    technology.  No evidence whatsoever that Netflix is

03:38:14  6    intending to try to move the case out of Delaware.

03:38:16  7          THE COURT:  So, under Federal Circuit precedent,

03:38:19  8    do you think I can consider the co-pending case?

03:38:26  9          MR. HENSCHKE:  Can and must.  I mean, when

03:38:28 10    you're talking about practical considerations under the

03:38:32 11    public interest factors of Jumara, judicial efficiency --

03:38:37 12          THE COURT:  Well, so I haven't gone back and

03:38:44 13    checked this, but my memory of opinions of the Federal

03:38:50 14    Circuit that I've seen and, you know, when there's a

03:38:54 15    transfer opinion usually in the mandamus context, I tend to

03:38:59 16    read those.  And I think I've seen a number of times where

03:39:06 17    they have done kind of what I think Mr. Jaffe said, which is

03:39:11 18    basically said that the co-pending case is irrelevant.

03:39:15 19          MR. HENSCHKE:  I'm not aware of that, Your

03:39:19 20    Honor.  And, indeed, in the cases that are cited in the

03:39:21 21    record here quite the opposite would be true.  Google's

03:39:25 22    referred to the Verizon case, and in that case it was about

03:39:31 23    the fact that the only basis for maintaining venue was that

03:39:35 24    the Court had previously, you know, handled similar cases in

03:39:38 25    the past.

03:39:39  1          THE COURT:  Well, that's in the past.

03:39:41  2          MR. HENSCHKE:  Yeah, but the Court expressly

03:39:43  3   distinguished that situation from another case called

03:39:47  4   Vistaprint.  And the difference between those two cases was

03:39:49  5   that in Vistaprint, there was a currently co-pending case

03:39:53  6   involving the same patents.  So, the Federal Circuit said in

03:39:56  7   the one instance, just having had past cases and nothing

03:39:59  8   else in favor of maintaining venue isn't good enough.  But

03:40:02  9   in the other case in Vistaprint, when you combine having

03:40:05 10   handled the past cases with the fact that there's now a

03:40:09 11   currently co-pending case, that is good enough.  And that

03:40:12 12   was the distinction between those two cases.

03:40:15 13          So, obviously, it is important in the case law.

03:40:19 14   And beyond that, of course, as Your Honor already said, it's

03:40:23 15   important from just common understanding of judicial

03:40:26 16   efficiency.  It would make absolutely no sense to have a

03:40:30 17   case involving the same exact patents in the same kind of

03:40:33 18   technology, have two cases, one tried in Delaware and one

03:40:37 19   tried in the Northern District of California at the same

03:40:39 20   time.

03:40:40 21          Obviously, the amount of duplicative and

03:40:42 22   overlapping work would be highly inefficient.  The

03:40:47 23   possibility of inconsistent rulings and decisions would be

03:40:50 24   very much in play.  And so, you want to avoid that situation

03:40:53 25   whenever you can.

03:40:54  1          And what we know about the current situation is

03:40:57  2     that there's a companion case here against Netflix involving

03:41:03  3     the same stuff, and they haven't shown any sign of trying to

03:41:06  4     get it out of California, I think because they realize how

03:41:09  5     weak a motion it would be to try to do so.  So, there's

03:41:13  6     another very valid reason for Robocast to want to keep this

03:41:16  7     case in Delaware.

03:41:17  8          And then beyond that, you know, Robocast has

03:41:20  9     many of its key operational employees, and legal

03:41:24 10     representatives and documents all here on the East Coast

03:41:29 11     nearby to Delaware.  So --

03:41:34 12          THE COURT:  But the Third Circuit, when it talks

03:41:39 13     about where documents are, the fact that it says distinguish

03:41:44 14     between documents that are subject to subpoena power of the

03:41:49 15     Court and --

03:41:54 16          MR. HENSCHKE:  Yes.  I'm not addressing this in

03:41:56 17     the context of the books and records prong of the Jumara

03:41:59 18     test, which I'll get to.  What I'm talking about now is:

03:42:02 19     Does Robocast have legitimate reasons for wanting to be here

03:42:05 20     in Delaware?

03:42:06 21          THE COURT:  All right.  Yeah.  I mean, as far as

03:42:08 22     I'm concerned, yeah, they have legitimate reasons.  I don't

03:42:12 23     think that's a problem.

03:42:13 24          MR. HENSCHKE:  So, to explain some things that

03:42:16 25     were at issue in the previous discussion here, if you look

03:42:19  1    at the Torres declaration, what you'll see is that the two

03:42:23  2    people running the day-to-day operations of the company --

03:42:27  3             THE COURT:  What are the day-to-day operations

03:42:29  4    of the company?  Does the declaration say that?  Because

03:42:32  5    it's --

03:42:34  6             MR. HENSCHKE:  I guess, I don't know that it

03:42:35  7    lays it out as explicitly as that, but it certainly gives

03:42:39  8    some indications.  What is the company up to?  Well,

03:42:42  9    obviously, this litigation is a big piece of it, first of

03:42:45 10    all.

03:42:46 11             Second of all, another thing that the

03:42:49 12    declaration does mention is that the company's in the

03:42:52 13    process of getting ready to release its latest wave of

03:42:57 14    software products which it's working on.  Those are all

03:43:01 15    largely being outsourced to third-party contractors who are

03:43:05 16    mostly in Europe, so I don't know that that really affects

03:43:10 17    the jurisdictional analysis at all.

03:43:12 18             And, of course, we talked about the fact that

03:43:13 19    Robocast is out there raising capital in order to finance

03:43:18 20    its software development efforts and perhaps its litigation

03:43:21 21    efforts.  So, it's some combination of all those things.

03:43:24 22    But what the Torres declaration tells you is that the two

03:43:28 23    people responsible for day-to-day operations of the company

03:43:31 24    are both right here on the East Coast.  One of those is the

03:43:36 25    president, Ed Robertiello, who is responsible for sort of

03:43:38  1   the day-to-day business operations of the company.  He's in

03:43:41  2   New Jersey.

03:43:42  3          And the second is Brett Smith, who's vice

03:43:45  4   president of legal and IP, who handles all the

03:43:49  5   patent-related matters and who oversees the litigation and

03:43:52  6   all that kind of thing.  He is located in New York City.

03:43:55  7          And I should point out Brett Smith was the

03:43:58  8   principal Rule 30(b)(6) witness on behalf of Robocast in the

03:44:03  9   two earlier cases against Microsoft and Apple.

03:44:08  10          So, these are not inconsequential witnesses.

03:44:11  11  These are the two witnesses running the business operations,

03:44:13  12  which is exactly what the Torres declaration says.  And

03:44:17  13  they're in New York and New Jersey.

03:44:19  14          All of Robocast's litigation counsel, including

03:44:22  15  myself, are here on the East Coast, principally in New York

03:44:26  16  City.  All of Robocast's patent prosecution counsel

03:44:30  17  responsible for prosecuting all the patents at issue in this

03:44:33  18  case are here in New York City.  All of Robocast's documents

03:44:38  19  are here in -- nearby in New York City.  All the corporate

03:44:43  20  documents, all the documents relating to the prior

03:44:45  21  litigations with Microsoft and Apple which are, obviously,

03:44:48  22  going to be a big focal point of these cases.

03:44:52  23          So, there's yet another reason why Robocast's

03:44:56  24  coming to Delaware is legitimate and rational.  And as Your

03:45:01  25  Honor suggested, once you know that, then you know that the

03:45:04  1    burden of proof becomes incredibly high for Google to

03:45:08  2    overcome, and that it requires compelling reasons of the

03:45:11  3    sort that we haven't heard anything about here at all.

03:45:14  4           Moving on, another very important Jumara private

03:45:19  5    interest factor would be convenience of the parties as

03:45:24  6    indicated by their relative physical and financial

03:45:27  7    condition.  And so, that's what the legal standard means by

03:45:30  8    convenience of the parties, as indicated by their relative

03:45:33  9    physical and financial condition.  And here you cannot

03:45:37 10    possibly have a greater disparity between Google-YouTube's

03:45:40 11    financial position and Robocast's, right.  We're talking

03:45:45 12    about Robocast being a four-person company with no current

03:45:48 13    revenues and di minimus assets.  And by contrast, you know,

03:45:52 14    Google-YouTube indisputably one of the world's biggest, and

03:45:56 15    largest and wealthiest companies who just earned

03:45:59 16    $257 billion in revenue in 2021.

03:46:03 17           So, when Your Honor was assessing this very same

03:46:06 18    kind of disparity in Robocast's previous cases against Apple

03:46:11 19    and Microsoft, this Court found that Robocast's financial

03:46:16 20    condition "pales in comparison to Apple's and that this

03:46:20 21    factor of the balancing test, therefore, significantly

03:46:23 22    disfavors transfer."  Those are Your Honor's words in

03:46:27 23    exactly the kind of situation that we're confronting here

03:46:30 24    under factor four, convenience of the parties.

03:46:32 25           And in addition, because Google and YouTube are

03:46:38  1    Delaware companies, this Court has previously held that they

03:46:42  2    must demonstrate a "unique and unexpected burden" in having

03:46:47  3    to litigate in Delaware in order for this test factor to

03:46:50  4    favor transfer.  Is there some unique and unexpected burden

03:46:54  5    for Google and YouTube to litigate this case here?  Of

03:46:57  6    course not.

03:46:59  7           And as Your Honor pointed out, Google and

03:47:02  8    YouTube are litigating here in Delaware all the time.  We

03:47:05  9    have submitted evidence with our papers showing that just in

03:47:09 10    recent years alone, Google has been a party in 38 different

03:47:15 11    litigations in this Court, many of which --

03:47:17 12           THE COURT:  I would think -- how many of them

03:47:20 13    were they the Defendant?

03:47:21 14           MR. HENSCHKE:  Many of which they were the

03:47:23 15    Plaintiff.  We've shown other instances in which --

03:47:25 16           THE COURT:  How many of them were they the

03:47:27 17    Plaintiff?

03:47:27 18           MR. HENSCHKE:  Either six or nine.

03:47:33 19           THE COURT:  Okay.

03:47:33 20           MR. HENSCHKE:  We've shown other instances where

03:47:35 21    Google has moved to transfer cases into Delaware.  We've

03:47:38 22    shown other instances where Google has resisted efforts to

03:47:42 23    transfer cases out of Delaware.  So, you know, that's not

03:47:46 24    quite what convenience of the parties actually means under

03:47:49 25    the Jumara factor, but, obviously, it's not inconvenient at

03:47:53 1   all for a company of that astronomical wealth, and resource

03:47:57 2   base and experience in this district to be litigating here

03:48:00 3   in this district.

03:48:01 4           And meanwhile, Robocast, with no funds and no

03:48:05 5   connection to California, is being questioned about whether

03:48:10 6   it would be more convenient for Robocast to litigate in

03:48:13 7   California.  It's not even close to possible.

03:48:16 8           So, the remaining Jumara private interest

03:48:21 9   factors, I would suggest only one of them favors even

03:48:26 10  arguably Google-YouTube in this case.  Factor number two,

03:48:30 11  Defendant's forum preference.  But, of course, this factor

03:48:33 12  carries very little weight in the overall balancing test

03:48:36 13  compared to the other factors we've talked about.  I mean,

03:48:39 14  if all it took for a company to get transferred out of

03:48:42 15  Delaware was to come in here and say, We'd prefer to be on

03:48:46 16  our home turf in Silicon Valley because that's where our

03:48:49 17  headquarters and some of our employees are, then, you know,

03:48:52 18  we'd have some very empty hallways here in Wilmington.

03:48:55 19          With regard to the remaining Jumara private

03:49:00 20  interest factors, I think they all have to be considered

03:49:03 21  neutral at best.  So, factor three talks about whether

03:49:06 22  claims in the case arose elsewhere rather than in Delaware.

03:49:10 23  And here, of course, we have nationwide patent infringement

03:49:14 24  claims that arise equally in all judicial districts,

03:49:18 25  including Delaware.

03:49:20  1          Robocast's infringement claims in this case
03:49:22  2    aren't addressed to the original design and development of
03:49:25  3    YouTube's products in California, but whether YouTube's
03:49:29  4    website is practicing the steps of the asserted method
03:49:32  5    claims.  And all that's been asserted in this case is method
03:49:35  6    claims.  And that infringement arises everywhere that
03:49:39  7    YouTube is offering streaming video playlists over the
03:49:42  8    Internet to computer users.  So, of course, that's occurring
03:49:45  9    equally in Delaware as it is anywhere else.  And that
03:49:48 10    becomes the neutral factor three.
03:49:51 11          Factor five, convenience of the witnesses, but
03:49:55 12    only to the extent that necessary third-party witnesses
03:49:58 13    would be unavailable for trial in Delaware, yet would be
03:50:01 14    available for trial in the Northern District of California.
03:50:05 15    Google-YouTube has failed to show that there would be some
03:50:09 16    consequential number of necessary third-party witnesses who
03:50:12 17    would be unavailable for trial in Delaware.  Indeed, they
03:50:16 18    haven't showed any such witnesses.
03:50:17 19          Instead, all we have in their motion papers are
03:50:20 20    speculative attorney arguments that are unsupported by any
03:50:23 21    evidence.  For example, Google-YouTube asserts that some
03:50:29 22    unnamed group of its former employees would be key witnesses
03:50:33 23    or that some unnamed group of Apple employees would be
03:50:37 24    unavailable witnesses in Delaware.  But Google fails to
03:50:43 25    identify who any of these people are.  It fails to identify

03:50:46  1   where they live.  It fails to identify what testimony of

03:50:50  2   importance to this case they supposedly have.  It fails to

03:50:53  3   explain how or why they would be unavailable in Delaware.

03:50:56  4   So, these are just completely speculative attorney arguments

03:51:00  5   and nothing more.

03:51:01  6           All that Google-YouTube specifically identifies

03:51:04  7   is a single prior art inventor, Alan Braverman, who it

03:51:10  8   claims resides in the Northern District of California and

03:51:13  9   would be unavailable for trial in Delaware.  Now, even

03:51:17 10   assuming that those unproven assertions are true, that would

03:51:21 11   carry no meaningful weight in this balancing test.  If you

03:51:24 12   look at the face of these patents, you have between two and

03:51:30 13   300 separate pieces of prior art that have been cited.  And

03:51:33 14   we're being told that the fact that one gentleman named

03:51:36 15   Mr. Braverman lives in the Northern District of California

03:51:39 16   is a critical fact that should tip the scales in this case.

03:51:45 17           And by the way, all of these patents issued over

03:51:48 18   the Braverman reference.  This Court denied all summary

03:51:53 19   judgment arguments previously premised on the Braverman

03:51:57 20   reference.  And Mr. Braverman was fully deposed on his prior

03:52:03 21   art in the Microsoft and Apple cases, and his deposition

03:52:07 22   transcript is in our hands and fully available for use in

03:52:09 23   this case.

03:52:10 24           So, at the end of the day, there's not really

03:52:13 25   any substance behind Google-YouTube's assertions of

03:52:17  1    unavailable trial witnesses.

03:52:19  2           Factor six, and Your Honor mentioned this

03:52:21  3    earlier, books and records.  Location of books and records,

03:52:26  4    but limited to the extent that they cannot be produced in

03:52:29  5    Delaware.  So, that's the legal standard.  Google-YouTube

03:52:34  6    focuses on the fact that certain of its documents are

03:52:36  7    located in the Northern District of California, but that's

03:52:40  8    not what the legal standard is.  The legal standard is:  Has

03:52:43  9    it proven that there would be files or documents that could

03:52:46 10    not be produced in Delaware?  Of course, it's proven nothing

03:52:50 11    of the sort, and I would say hasn't even attempted to argue

03:52:53 12    that, which is the required legal standard.  And even if the

03:52:57 13    physical location of documents were the dispositive factor,

03:53:00 14    which they aren't, we've already heard that all of

03:53:03 15    Robocast's documents, literally the entirety, are in New

03:53:07 16    York City right next door to Delaware.

03:53:09 17           So, public interest factors, and I'll make this

03:53:14 18    quick because only one of them really is relevant.  And I'm

03:53:19 19    talking about factor eight, practical considerations.  The

03:53:24 20    practical considerations of judicial economy and judicial

03:53:27 21    efficiency overwhelmingly weigh in favor of retaining

03:53:31 22    jurisdiction in Delaware.  By previously presiding over the

03:53:36 23    Microsoft and Apple cases, this Court's developed extensive

03:53:40 24    familiarity with those patents and technology, a highly

03:53:44 25    relevant body of precedent.  Three-and-a-half years of time

03:53:47  1    and effort on the Court's part and on Robocast's part were

03:53:51  2    put into those cases.  And as we said, the Court made all

03:53:55  3    manner of substantive rulings on all kinds of issues that

03:53:59  4    remain highly viable today.  It would make no sense to send

03:54:02  5    that to the Northern District of California and to have

03:54:05  6    somebody figure that out all over again from scratch, much

03:54:08  7    less create inconsistent rulings.

03:54:10  8          The Court said in your Round Rock decision,

03:54:14  9    which we've quoted in the papers, the Court said, I quote,

03:54:18 10    "Certainly if I already had some experience with the

03:54:22 11    patents, it would be an important legitimate concern" in

03:54:25 12    terms of retaining venue.  Of course that's true.

03:54:28 13          And also, in terms of these practical

03:54:32 14    considerations, the Court's already going to be handling the

03:54:35 15    Netflix case.  Judicial efficiency says that you don't want

03:54:39 16    to have the two different cases in two different places.  It

03:54:43 17    would result in overlapping and duplicative work efforts.

03:54:47 18    Transfer would cause a serious risk of inconsistent rulings

03:54:51 19    between the two cases.

03:54:52 20          The only other public interest factor that I

03:54:56 21    think really is decisive here, in one way or another, and

03:55:00 22    it's not a big one, I guess, is factor 11, public policies

03:55:03 23    of the fora.  And Your Honor's held many times that Delaware

03:55:09 24    encourages use of the Delaware courts here to resolve

03:55:12 25    disputes between Delaware companies.

03:55:14   1          All the remaining public interest factors in

03:55:18   2   Jumara are either neutral or completely inapplicable.  So,

03:55:22   3   in the neutral camp, factor seven, enforceability of

03:55:26   4   judgment.

03:55:27   5          THE COURT:  Right.  I've got the neutral ones.

03:55:29   6          MR. HENSCHKE:  Yeah.

03:55:30   7          THE COURT:  Do you have anything else,

03:55:31   8   Mr. Henschke?

03:55:34   9          MR. HENSCHKE:  If there are any questions about

03:55:36  10   Robocast's activities, I guess, based on what came up

03:55:39  11   earlier, I would be happy to respond to those.

03:55:42  12          THE COURT:  I don't think that's necessary.  So,

03:55:47  13   why don't you have a seat.

03:55:49  14          And, Mr. Jaffe, do you agree that Google's been

03:55:59  15   Plaintiff to six to nine cases in this Court over what time

03:56:02  16   period Mr. Henschke was referring to?

03:56:06  17          MR. JAFFE:  Your Honor, I haven't gone back and

03:56:09  18   looked at all the numbers exactly.  I'm aware of the two

03:56:12  19   that came up within the briefing.  I'm not aware of the

03:56:15  20   others on the exact numbers.

03:56:17  21          THE COURT:  All right.  The Vistaprint case,

03:56:20  22   once upon a time I read that, but not in the last two weeks.

03:56:25  23   What does that say about co-pending cases, as far as you're

03:56:28  24   concerned?

03:56:29  25          MR. JAFFE:  That the case is distinguishable

03:56:31   1   from the case here.  In that case, no Defendant party was

03:56:35   2   actually located in the transferee venue.  And the presence

03:56:40   3   of the witnesses in that location is not overwhelming.  And

03:56:42   4   I'm quoting Vistaprint 628 F.3d at 1346 through 47.  So,

03:56:48   5   that case is not analogous to us here.

03:56:51   6          If I may address just a couple points.

03:56:54   7          THE COURT:  Yes.  Please be quick.

03:56:56   8          MR. JAFFE:  Sure.  To boil it down, Plaintiff

03:57:00   9   seems to think that because they litigated their prior case

03:57:03  10   here, they get a free pass to litigate all cases here

03:57:08  11   forever, regardless of the actual convenience of the parties

03:57:10  12   under Section 1404.  The Federal Circuit has instructed that

03:57:14  13   it's the wrong approach and said, "just because a patent is

03:57:18  14   litigated in a particular forum does not mean that the

03:57:21  15   patent owner will necessarily have a free pass to maintain

03:57:24  16   all future litigation involving that patent in that forum.

03:57:28  17   See e.g. In Re:  Google."  And it's a case from earlier this

03:57:32  18   year, May 2022.  So, that's point one.

03:57:35  19          Counsel kept saying that the focal point of the

03:57:40  20   case is going to be all these prior things.  We are a

03:57:42  21   different Defendant.  We are not Microsoft.  We are not

03:57:45  22   Apple.  Under the Genentech case, the bulk of the evidence

03:57:49  23   is going to come from the Defendant.  We are the Defendant,

03:57:52  24   and the evidence is in the Northern District of California.

03:57:55  25          They keep referring to the prior case, and to

03:57:58 1    the extent that the evidence that they have in New York is

03:58:02 2    related to Apple and Microsoft, that is not the relevant

03:58:05 3    evidence we're looking at for purposes of this case,

03:58:07 4    primarily speaking.

03:58:11 5            The other thing I wanted to mention, just to

03:58:13 6    clarify a point, they brought up the IPRs --

03:58:16 7            THE COURT:  Right.  I was just -- yeah, go

03:58:19 8    ahead.

03:58:20 9            MR. JAFFE:  So, there were three IPRs that were

03:58:22 10   filed on all three patents-in-suit.  Those were not filed by

03:58:26 11   Google or YouTube.  Two were filed by Netflix, and one was

03:58:30 12   filed by another -- by a firm called Unified Patents.

03:58:33 13           THE COURT:  Right.  I've heard of that.

03:58:36 14           MR. JAFFE:  These go -- actually support the

03:58:38 15   transfer decision.  And then those are different situations.

03:58:41 16   Netflix is differently situated, as things currently stand,

03:58:45 17   from Google.  They have their own IPRs, as those things

03:58:49 18   stand today, that Google did not file.  So, it kind of shows

03:58:54 19   the divergence of the cases at this point in that their IPRs

03:58:57 20   have taken one stance where Google has not filed IPRs on

03:59:00 21   these at this moment.

03:59:01 22           I also wanted to address the kind of inequities

03:59:07 23   of the parties that counsel mentioned.  And I want to go

03:59:10 24   back to Your Honor's decision in the Express Mobile case.

03:59:13 25   And Your Honor addressed the exact argument that Plaintiff

03:59:17  1    attempts to make here.  And I'm going to quote.  "Plaintiff

03:59:21  2    argues that Defendant is a $2 billion company that would not

03:59:26  3    suffer any undue financial burden if litigated in Delaware."

03:59:30  4    I'm going to omit the cite.  "Defendant certainly has the

03:59:33  5    capability of litigating in Delaware; however, it is

03:59:36  6    unreasonable to subject all parties to an inconvenient forum

03:59:40  7    when a forum exists that would significantly reduce the

03:59:43  8    burden of at least one of the parties."

03:59:46  9           That's the situation we find ourselves in here

03:59:48 10    where the Northern District of California is the more

03:59:51 11    convenient for the Defendants as well as closer to the

03:59:55 12    location of the CEO and the COO where the principal office

04:00:00 13    of the Plaintiff is in Idaho.  I noticed that counsel didn't

04:00:04 14    address Mr. Torres and his role in the business.  If you

04:00:08 15    were to hear them say it, the CEO apparently has no role in

04:00:11 16    the day-to-day operations of the business, which seems

04:00:14 17    counter to the title itself.

04:00:19 18           And the other thing I wanted to mention is in

04:00:22 19    terms of where the claims arise for purposes of that Jumara

04:00:29 20    factor, counsel mentioned that the claims arise anywhere.

04:00:31 21           THE COURT:  No, I got that one.

04:00:34 22           MR. JAFFE:  All right.

04:00:35 23           THE COURT:  All right.  So, then let's be done.

04:00:40 24           MR. JAFFE:  Thank you.

04:00:41 25           THE COURT:  Let me just take a short break here.

04:00:45  1    All right.  I'll be right back.

04:00:47  2                    DEPUTY CLERK:  All rise.

04:03:19  3                    (Recess was taken.)

04:08:55  4                    DEPUTY CLERK:  All rise.

04:08:57  5                    THE COURT:  So, let's be seated.  So, I do

04:09:15  6    follow the Section 1404(a) transfer analysis that's in

04:09:20  7    *Jumara vs. State Farm Insurance Company*, 55 F.3d 873, which

04:09:27  8    is a Third Circuit case from 1995.

04:09:31  9                    I, of course, also consider the various Federal

04:09:36 10    Circuit cases occasionally interpreting Third Circuit law,

04:09:39 11    mostly interpreting Fifth Circuit law, but they are

04:09:42 12    relevant.  And so, nobody's disputing there is jurisdiction

04:09:46 13    in the Northern District of California.  So, I have the

04:09:50 14    power to transfer this case to the Northern District of

04:09:55 15    California.

04:09:55 16                    And no one disputes that the burden that's

04:10:01 17    establishing the need for transfer rests with the moving

04:10:04 18    party here, Google and YouTube.  And so, there are the

04:10:08 19    various Jumara interests that I'm supposed to consider which

04:10:12 20    the parties have mostly touched on in their argument today.

04:10:19 21    You know, there is Plaintiff's forum preference as

04:10:23 22    manifested in their original choice, which as I've said on

04:10:28 23    various occasions before, is the paramount consideration,

04:10:36 24    which is what Third Circuit law says.

04:10:39 25                    But I have also said that it's not quite as

04:10:45   1   strong when the Plaintiff's only connection to Delaware is

04:10:53   2   its incorporation here.  That then it's really not

04:11:00   3   Plaintiff's home turf.  It doesn't mean it's not the

04:11:04   4   paramount consideration which, as I've said, to me means the

04:11:09   5   most important, but it gets slightly less weight in the

04:11:16   6   balancing.  And, you know, sometimes the judges here are

04:11:20   7   arguing back and forth as to whether that's connected with

04:11:24   8   this factor or one of the other factors, but it works into

04:11:30   9   the analysis somewhere.

04:11:32  10           I consider the Defendants' preference, which is

04:11:35  11   the Northern District of California.  And, you know, the

04:11:44  12   Defendants have a perfectly rational choice for wanting to

04:11:48  13   litigate in the Northern District of California, that is, I

04:11:53  14   think, entitled to significant weight.  It's not entitled to

04:11:58  15   as much weight as the Plaintiff's choice, but it is here a

04:12:02  16   significant factor as it usually is.  And then really then

04:12:10  17   the question is:  How do the rest of the factors play out?

04:12:13  18           You know, the third factor is whether the claim

04:12:17  19   arose elsewhere.  And in this connection, I don't agree with

04:12:24  20   the Plaintiff so much that this is a factor that favors the

04:12:31  21   Plaintiff.  I think it's a factor that actually favors the

04:12:34  22   Defendant because the Federal Circuit has, on a number of

04:12:42  23   occasions, said, in so many words, that in terms of wherever

04:12:48  24   the claim arises, it's where the infringing technology is

04:12:51  25   developed, not where, you know, for example, a product is

04:12:57 1    sold.  And so, I think this -- it seems to be undisputed

04:13:03 2    that Google and YouTube developed whatever exactly the

04:13:08 3    accused product is somewhere in the Bay area.  And so, this

04:13:17 4    marginally favors transfer.

04:13:19 5            The fourth factor is the convenience of the

04:13:22 6    parties as indicated by their relative physical and

04:13:25 7    financial condition.  I think pretty clearly this factor

04:13:29 8    favors Robocast.  Robocast is a four-person company.  Google

04:13:36 9    is still omnipresent everywhere.  I guess that's what

04:13:52 10   omnipresent means.  And, you know, it's one of the most

04:14:01 11   financially successful corporations, particularly Google,

04:14:07 12   you know, anywhere.  So, the consideration here is in favor

04:14:23 13   of Robocast because they are a four-person company with

04:14:27 14   apparently little or no current income.

04:14:29 15           The fifth factor is the convenience of the

04:14:33 16   witnesses, but only to the extent the witnesses may actually

04:14:36 17   be unavailable for trial in whatever fora.  And here, you

04:14:42 18   know, Google's track record on this is not so good.  They

04:14:47 19   said two people in the briefs.  One of them was pointed out

04:14:50 20   lives in Washington, which tends to make them at least not

04:14:55 21   subject to the subpoena power of either Court.

04:14:58 22           The other one is Mr. Braverman.  And I believe

04:15:07 23   Mr. Jaffe said when I asked, well, where is he, he said,

04:15:11 24   well, based on his LinkedIn page, he's still in the Northern

04:15:16 25   District of California.  And I accept that.  But one of the

04:15:21  1    things it indicates to me, I haven't heard anything that

04:15:24  2    makes the suggestion that Mr. Braverman would be unwilling

04:15:30  3    to come to Delaware if requested.  He certainly couldn't be

04:15:36  4    subpoenaed.

04:15:37  5              And one of the things that I had done before the

04:15:41  6    argument today, but I had only done it partly, was I looked

04:15:45  7    at the witness list in the Pretrial Order in the 10-1055

04:15:52  8    case, which was the Microsoft lawsuit.  And in that case, in

04:16:00  9    Document 5, Docket Item 508-5 filed in February of 2014,

04:16:10 10    Microsoft listed Mr. Braverman as a witness.  And in the way

04:16:17 11    things are done in that particular Pretrial Order, under the

04:16:21 12    expect to call or may call, they had him down as may call.

04:16:25 13    And under the in person or by deposition, they had him down

04:16:28 14    as in person or by deposition.  And they had a number of

04:16:33 15    other people who are in person.  They had a number of people

04:16:37 16    who were by deposition.  But certainly the indication one

04:16:40 17    would get from this is that Microsoft, ten days before

04:16:43 18    trial, thought that if they wanted -- that there was a

04:16:48 19    reasonable possibility that Mr. Braverman would appear in

04:16:51 20    Delaware for a trial.

04:16:53 21              So, I think in terms of the Defendants showing

04:17:00 22    that there's a witness who's arguably important and is

04:17:05 23    unavailable for trial, I don't think they've shown that.

04:17:10 24    So, I think that that under the Third Circuit law is pretty

04:17:17 25    much neutral.

04:17:18  1          The location of books and records "similarly
04:17:22  2   limited to the extent that the files could not be produced
04:17:25  3   in the alternative forum," I think Mr. Henschke said this,
04:17:31  4   the only books and records, with the one exception of
04:17:36  5   reference to Mr. Braverman's former -- of course, through
04:17:43  6   pretrial subpoena -- so, anything that the Defendants or the
04:17:47  7   Plaintiff has, that could be produced in Delaware.  In my
04:17:56  8   experience, anything anybody else in the United States has
04:18:00  9   can also be produced in Delaware by doing a deposition
04:18:03 10   subpoena before trial.  So, I think that is pretty much
04:18:08 11   neutral, too.
04:18:09 12          The public interest, which the parties didn't
04:18:14 13   spend a lot of time on and probably for good reason because
04:18:17 14   a lot of them are pretty much just neutral enforceability of
04:18:21 15   the judgment, that's neutral.
04:18:24 16          The familiarity of the trial judge with the
04:18:28 17   applicable state law in diversity cases, that is not
04:18:31 18   applicable.
04:18:32 19          The public policies of the fora, Mr. Henschke
04:18:36 20   cited correctly that at various times in the distant past
04:18:42 21   and perhaps in the first Robocast transfer cases that I
04:18:48 22   said, you know, Delaware has a public policy favoring that
04:18:52 23   Delaware corporations litigate in Delaware.  You know, I've
04:18:58 24   since considered that a little more, and I think that the
04:19:01 25   more precise statement is public policy is that Delaware

04:19:06  1    corporations litigate in the State Courts in Delaware.  I

04:19:09  2    don't think Delaware cares who litigates in federal courts.

04:19:13  3    So, I think that's neutral.

04:19:15  4          One of the factors that nobody mentioned today

04:19:19  5    was the "local interest in deciding local controversies at

04:19:23  6    home."  You know, patent litigation is not a local

04:19:28  7    controversy, and so I think that's neutral.

04:19:31  8          Then the other two, which there was more

04:19:35  9    discussion, either today or in the briefing, let me first

04:19:38 10    address "the relevant administrative difficulty in the two

04:19:42 11    fora resulting from Court congestion."  And the parties

04:19:47 12    cited different statistics in their briefing.

04:19:50 13          One side cited weighted average case, which is

04:19:55 14    what Delaware judges tend to prefer because we think that

04:19:59 15    gives a better idea of how much work there actually is.  But

04:20:02 16    the other cited just raw numbers.  The raw numbers suggest

04:20:08 17    heavier case loads in the Northern District of California.

04:20:12 18    The weighted case load suggests heavier case load in this

04:20:15 19    district.

04:20:18 20          As a practical matter, though, I think it's

04:20:22 21    pretty close.  And one of the things that both sides cited,

04:20:26 22    I believe, was how long it takes to get to trial.  In the

04:20:32 23    one district, it was 32 months.  And the other one, it was

04:20:35 24    33 months.  So, those might not be the exact numbers, but

04:20:40 25    the numbers were in the briefing.  And there was essentially

04:20:42 1    a one-month difference, which to me, given the imprecision

04:20:49 2    of which is such a small difference as to be negligible, and

04:21:01 3    I think not borne out in any particular case.  So, I think

04:21:06 4    the relevant administrative difficulties essentially is

04:21:10 5    neutral, too.

04:21:10 6              And then there are the practical considerations

04:21:13 7    to make the trial easy, expeditious or inexpensive.  And

04:21:21 8    it's true that in some other cases, I have said something

04:21:24 9    like, because I think this is the way to do it, that we're

04:21:31 10   kind of looking at the overall cost to the parties.

04:21:40 11             So, that, for example, in the Express Mobile

04:21:44 12   where the Plaintiff was from California, and Delaware and

04:21:49 13   Florida were both roughly the same lengthy plane ride away,

04:21:55 14   the fact that it really didn't have any impact on the

04:21:59 15   Plaintiff didn't mean that the fact that the Defendant would

04:22:05 16   there -- it would be much easier for the Defendant in

04:22:07 17   Florida, which is where they were.  You know, I thought that

04:22:13 18   was significant.

04:22:18 19             You know, it's a lot harder in terms of

04:22:31 20   Robocast, or actually this was part of the reason why I was

04:22:35 21   really looking at the Microsoft list of witnesses.  Because

04:22:41 22   in the Microsoft trial, this is Docket Item 508-3 you know,

04:22:50 23   after Mr. Torres and Jenna Torres, who I take it is not one

04:22:58 24   of the four people who still works there, or maybe she never

04:23:02 25   worked there.

04:23:03 1          But the next person listed is Brett Smith, and

04:23:07 2   it says next to it may call in person.  I heard that he was

04:23:12 3   the 30(b)(6) witness ten years ago.  I suspect he may be the

04:23:18 4   30(b)(6) witness again.

04:23:21 5          And the point, I guess, is that it's a relative

04:23:42 6   wash, I think, in terms of -- based on the record I have in

04:23:45 7   front of me as to what might make the trial easy,

04:23:49 8   expeditious or inexpensive for Robocast.  You know, there

04:23:55 9   would be some savings clearly for Google if it were in the

04:23:59 10  Northern District of California.  So, I guess this factor

04:24:06 11  marginally favors Google.

04:24:09 12         I've also considered a couple other things.  I

04:24:16 13  considered -- you know, part of the backdrop to this is

04:24:20 14  there are no witnesses or documents in Delaware.  But I've

04:24:25 15  also considered, and we had some discussion today about

04:24:30 16  Netflix and the co-pending case.  And so, in terms of the

04:24:48 17  co-pending case, Mr. Henschke had cited Vistaprint.  And so,

04:24:54 18  I, during the break, got at least part of Vistaprint, which

04:25:02 19  is at 628 F.3d 1342, Federal Circuit 2010.  And I believe

04:25:08 20  that was a mandamus from Texas, but maybe it was -- whatever

04:25:14 21  it was, it was a Federal Circuit decision.

04:25:17 22         And the quote I have here, "Our holding today

04:25:24 23  does not mean that once the patent is litigated in a

04:25:28 24  particular venue, the patent owner will necessarily have a

04:25:31 25  free pass to maintain all future litigation involving the

04:25:35  1   patent in that venue.  However, whereas here, the trial

04:25:40  2   Court performed a detailed analysis explaining they're very

04:25:44  3   familiar with the only asserted patent and the related

04:25:47  4   technology and where there is co-pending litigation before

04:25:50  5   the trial Court involving the same patent-in-suit and

04:25:55  6   pertaining to the same underlining technology and accusing

04:25:58  7   similar services.  We cannot say the trial Court clearly

04:26:01  8   abused its discretion denying transfer."  It sounds like

04:26:06  9   this was a mandamus decision.

04:26:08 10        And, you know, I'm not as optimistic as

04:26:16 11   Mr. Henschke that the technical details of this litigation

04:26:22 12   or of this technology will come back to me.  I do tend to

04:26:29 13   agree with Mr. Henschke that I have some leg up on any other

04:26:36 14   judge trying to interpret the various things that I wrote

04:26:40 15   and that I did write a lot of things in both the Microsoft

04:26:43 16   and the Apple case.  And I do remember a lot of the

04:26:54 17   non-technological parts of the cases.

04:26:59 18        And so, and I do agree with Mr. Jaffe that this

04:27:06 19   was ten years ago, more or less.  But certainly I'm pretty

04:27:12 20   sure that I'm the only federal judge in the country that has

04:27:15 21   any familiarity with, I believe, it's the '541 Patent.  And

04:27:20 22   I do expect the other two patents have fairly related

04:27:25 23   technology.  And so, I think that even if my recall of what

04:27:33 24   I did before, certainly is going to need a big memory jog to

04:27:38 25   be useful, I do think that the co-pending litigation that's

04:27:45 1  before me involving the same three patents-in-suit, one of

04:27:48 2  which is the patent-in-suit that I did ten years ago, that,

04:27:52 3  obviously, it would have to involve the same underlying

04:27:55 4  technology because it's the same patent-in-suit.  I don't

04:28:00 5  know whether the services accused are similar or not, but

04:28:05 6  that seems to me to at least factor in marginally the

04:28:09 7  balance in favor of me not transferring the case.

04:28:13 8          So, in any event, when considering all of these

04:28:36 9  things together, and particularly when considering the Third

04:28:42 10 Circuit law about Plaintiff's forum preference, I don't

04:28:47 11 think that the Defendants have met their burden of showing

04:28:53 12 that I should transfer this case to the Northern District of

04:28:59 13 California.  So, I'm going to deny their motion, and I will

04:29:04 14 sign some Order to that effect pretty soon.

04:29:07 15         All right.  So, that's it for today.

04:29:12 16         Have the Defendants answered the Complaint?

04:29:16 17         MR. JAFFE:  Yes, Your Honor.

04:29:17 18         THE COURT:  Okay.  So, I expect you're going

04:29:25 19 to -- have you gotten a call from my office already yet --

04:29:29 20 probably not given this motion -- saying that you should,

04:29:32 21 you know, come up with a schedule?

04:29:34 22         MR. JAFFE:  No, we have not.

04:29:36 23         THE COURT:  Okay.  Well, I'm sure you'll get it

04:29:38 24 from a more efficient person than me, but why don't you

04:29:41 25 start working on considering the schedule.  Do you have a

04:29:44  1    sense, either one of you, because, obviously, it would be

04:29:49  2    nice to have a coordinated schedule with Netflix.  Though,

04:29:52  3    if they're busy choosing IPRs and pursuing IPRs, they may be

04:29:58  4    not that interested.

04:30:00  5              In any event, as far as you know, there's

04:30:11  6    nothing in the Netflix case prohibiting or that I need to

04:30:15  7    decide before deciding to at least find out what they want

04:30:18  8    to do; right?

04:30:20  9              MR. HENSCHKE:  They're pending.

04:30:22 10              THE COURT:  All right.  Well, we'll put out some

04:30:29 11    notice to try to get all three parties in for a scheduling

04:30:33 12    conference in the new year.

04:30:38 13              Anything else?

04:30:40 14              MR. HENSCHKE:  Does Your Honor have any sense of

04:30:42 15    how far out that's likely to be scheduled from now?

04:30:48 16              THE COURT:  No.

04:30:51 17              MR. HENSCHKE:  Fair enough.

04:30:52 18              THE COURT:  All right.  So, off the record,

04:30:54 19    could I see Mr. Cottrell and Mr. Brauerman for a minute?

04:31:04 20    And we'll be in recess.

04:31:06 21              DEPUTY CLERK:  All rise.

         22              (Court was recessed at 4:31 p.m.)

         23

         24

         25

1          I hereby certify the foregoing is a true and

2     accurate transcript from my stenographic notes in the

3     proceeding.

4                         /s/ Heather M. Triozzi
                          Certified Merit and Real-Time Reporter
5                         U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25